# Exhibit 1
## Expert Witness Report
## Gregory S. Blimling, Ph.D.

Tafari A. Haynes vs. Clarion University of Pennsylvania et al.

Expert Witness Report

Gregory S. Blimling, Ph.D.
2960 Casalon Circle
Superior, CO 80027

Biographical Sketch

Gregory S. Blimling, Ph.D.

Dr. Gregory Blimling retired in 2016 as a professor in the Rutgers University Graduate School of Education where he taught college student affairs and higher education in the department of Educational Psychology. Prior to retiring, he served for 43 years as a student affairs administrator and professor, 22 years of which as a chief student affairs officer. He was Vice President for Student Affairs at Rutgers University for 8 years and Vice Chancellor for Student Development at Appalachian State University in North Carolina for 14 years. Prior to joining Appalachian as a vice chancellor and professor in the Department of Human Development and Psychological Counseling, Dr. Blimling served as Dean of Students at Louisiana State University – Baton Rouge and in other administrative roles earlier in his career. He received his Ph.D. in Educational Policy and Leadership in Higher Education and College Student Personnel Work from Ohio State University. His master's degree in College Student Personnel Administration and his bachelor's degree are from Indiana University.

Dr. Blimling is the author, co-author, or editor of 7 books about college students and an extensive number of journal articles, academic papers, monographs, and other scholarly contributions in higher education and student affairs. His most recent book is Student Learning in College Residence Halls: What Works, What Doesn't, and Why (Wiley/Jossey Bass, 2015). For 9 years, he served as the Editor of the Journal of College Student Development, higher education's leading academic journal about the psychosocial For 6 years, he served as a Senior Scholar for ACPA - College Student Educators International, and for 2 years as the co-chair of the national study group that wrote the Principles of Good Practice for Student Affairs. In 2004, Dr. Blimling was elected President of ACPA - College Student Educators International, one of two national professional and cognitive development of college students. associations for student affairs administrators and educators.

Dr. Blimling's scholarship and administration of student affairs have been recognized by a number of national awards including the *Contribution to Knowledge Award (ACPA), the Outstanding Contribution to Literature and Research Award (NASPA), the Dissertation of the Year Award (NASPA), and by a number of regional and state awards* including the North Carolina Distinguished Scholar Award for student affairs, and the Southern Association of College Student Affairs Melvene Hardee Award for Outstanding Achievement in Student Personnel Work. He also has received awards for his scholarship and administration in student affairs from Ohio State University, Indiana University, Western Illinois University, and Bowling Green State University. In 2012, the Rutgers University Graduate School of Education awarded him the Distinguished Leader in Education (Academia*) Award* for significant scholarly contributions and leadership in the field of education, their highest national award for academic accomplishment.

Tafari A. Haynes Vs. Clarion University of Pennsylvania et al.
Review and Analysis
Gregory S. Blimling, Ph.D.

I was retained by the Law Offices of Dana Bazelon, LLC, and Ross Legal Practice to review documents, transcripts, and depositions, in the case of Tafari A. Haynes vs. Clarion University of Pennsylvania, et al. and to give my opinion concerning the procedures and processes used to expel Mr. Haynes from Clarion University in 2013. In doing so, I was asked to identify due process irregularities in the student conduct procedures, the grades he received for the semester he was expelled, and issues related to concurrent criminal and disciplinary cases involving an enrolled student. In addition, I was asked to address the application of *Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 et seq* sexual assault guidelines related to this case. Finally, I was asked to give my opinion as a student affairs professional about how the university met its fiduciary responsibility to attend to the welfare of Mr. Haynes subsequent to the accusations of misconduct made against him by ▇▇▇▇▇▇▇▇.

I reviewed the material referenced in Appendix I of this report between June 6, 2017 and June 25, 2017. My opinions are based on a review of the documents, transcripts, exhibits, and depositions listed and are based on my 43 years of experience in student affairs administration as a college administrator and professor. I did not interview any of the defendants referenced in the case nor have I met or interviewed Mr. Haynes or ▇▇▇▇▇▇▇▇.

## Due Process Issues

**Interim Suspension:** On October 27, 2013 Mr. Haynes was arrested by the Clarion University Police pursuant to a claim of rape made by ▇▇▇▇▇▇▇▇. The Coordinator for Judicial Affairs and Residence Life, Mr. Shaffer, received a telephone call from Clarion University Police notifying him of the alleged sexual assault. Mr. Shaffer contacted Mr. Tripp, the Vice President for Student and University Affairs, and together they decided to suspend Mr. Haynes from Clarion University for an interim period of ten business days, prohibit him from being on Clarion University property without prior approval, prohibited him from any contact with the complainant, ▇▇▇▇▇▇▇▇, and prohibited him not only from attending his classes but also from taking any of his classes online while he was off-campus.

The decision to suspend Mr. Haynes was made without interviewing the complainant, ▇▇▇▇▇▇▇▇ without interviewing Mr. Haynes, and without corroborating evidence to support ▇▇▇▇▇▇▇'s allegation. It is my opinion that Vice President Tripp and Mr. Shaffer acted precipitously without sufficient evidence and without regard for the impact of this decision on Mr. Haynes. The decision to invoke interim suspension disregarded his right to the presumption of innocence and set in motion a chain of events that ultimately denied Mr. Haynes a fair and impartial resolution to the allegations.

The decision to suspend Mr. Haynes from Clarion University without a hearing and deny him access to classes, friends, faculty, and institutional resources imposed on the University a duty to show that Mr. Haynes presented an *"immediate threat of harm"* to himself, *"other students, university personnel, or to university property" (*Pennsylvania Code, Title 22, Part XVII, Board of Governors Pennsylvania State System of Higher Education, Chapter 505 (Student Personnel), Student Disciplinary Due Process, sec. 505.9).

There is nothing in the depositions, documents, hearing transcripts, or email correspondence to suggest that Mr. Haynes presented an "immediate threat" of harm to himself, others in the university community, or to university property. The allegation against Mr. Haynes was that he forced himself on ▇▇▇ ▇▇▇▇▇▇, a young woman with whom he had a social relationship. She never alleged that he was

physically violent with her, and there was nothing in his record to suggest that he posed a physical threat to others on campus. Mr. Haynes made no verbal or written threats of violence, had no disciplinary history of violent behavior, no criminal record of violent behavior, and there was no evidence that he was contemplating any behavior that placed others at risk.

Absent an immediate threat of harm to others in the university community, Mr. Shaffer and Vice President Tripp had an obligation to assume that Mr. Haynes was innocent of the allegations made by the complainant and allow him to continue his education while he worked to resolve the pending criminal matter and disciplinary charges arising from the allegations. Vice President Tripp and Mr. Shaffer made an error in judgment when they suspended Mr. Haynes based on an unproven allegation and the decision by law enforcement authorities to charge him with a crime.

By suspending Mr. Haynes from Clarion University without at least a preliminary hearing to guard against mistaken information and to base a decision to suspend him solely on the uncorroborated allegation of one student – an allegation Mr. Haynes denied – the University treated Mr. Haynes unfairly and contrary to its published policies. Mr. Haynes' life was significantly disrupted; and, he was denied access to the very resources, support, and personnel he needed to aid him in preparing his response to the disciplinary charges. Had Mr. Haynes continued to attend Clarion University, it is entirely possible that with the support of University personnel and the assistance of his attorney he could have negotiated an institutional accommodation that would have allowed him to resolve the pending criminal charges prior to the adjudication of the charges before the University Conduct Board (UCB) or at the least, obtain the results of ███████████'s rape kit showing that his DNA was not present.

Members of the Clarion University community were not faced with an immediate threat of harm from Mr. Haynes and Mr. Shaffer and Vice President Tripp failed to exercise other available options they had to separate the students so that both students could continue their education while the University conducted its investigation and give Mr. Haynes the time he needed to gather evidence in his defense. Nothing in ███████████'s allegations, even if they were taken as true, suggested that Mr. Haynes would assault other students on campus.

Investigation: The Office of Civil Rights OCR (Dear Colleague Letter, 2011) requires universities to conduct a "prompt, thorough, and impartial" investigation into allegations of sexual misconduct. The documents and depositions I reviewed showed that the University was prompt, but was neither thorough or impartial. Clarion University Police documents showed that there were 10 witnesses, not including the complainant, that may have been able to provide evidence concerning the events of October 26-27, 2013. None of these witnesses were interviewed by Mr. Shaffer or his staff as part of the investigation into the allegation and none of the witnesses appeared at the UCB hearing on December 3, 2013. Furthermore, Mr. Shaffer did not have ███████████ provide a written statement of her complaint, interview her concerning the events of October 26-27, 2013, or question her about inconsistences in her account of the alleged assault. Instead, Mr. Shaffer relied on what he heard as an observer at Mr. Haynes' preliminary court proceeding, the purpose of which Mr. Shaffer acknowledged in his deposition that he did not fully understand.

Mr. Shaffer denied a request from Mr. Haynes' mother, Ms. Hyacinth Cynthia Malone, to delay the hearing until after the criminal proceedings. In her deposition, Ms. Malone said she pleaded with Mr. Shaffer to give her son the time he needed, saying that *"I was crying. I was begging, begging, begging Matt* [Shaffer] *to please don't rush to judgement. I know my son. I know he didn't do it. I begged him to wait until after the criminal case."* Malone Dep. p. 55. Despite Ms. Malone's pleading on behalf of her son, Mr. Shaffer proceeded with scheduling the hearing without regard for evidence Mr. Haynes needed to prove his innocence and without regard for the legal jeopardy Mr. Haynes would place himself in by

testifying in the University disciplinary hearing, without the benefit of full representation by an attorney, prior to a resolution of the pending criminal charges.

Because Vice President Tripp and Mr. Shaffer suspended Mr. Haynes under the interim suspension policy, the University assumed an obligation to give Mr. Haynes a hearing within ten business days of the suspension. In actuality, Mr. Haynes' ten-day interim suspension lasted for 37 calendar days, approximately 24 business days, some of which time Mr. Haynes was detained by law enforcement authorities prior to posting bail. Mr. Shaffer also was bound by the 60-day rule that Clarion University created to resolve sexual assault complaints (discussed later in this report) which the institution misinterpreted as a requirement under OCR Title IX guidelines. Had Mr. Shaffer not rushed to have a hearing, or if he would have granted Mr. Haynes' request for a delay, or if he would have reinstated Mr. Haynes following his release from custody, Mr. Shaffer would have had sufficient time to interview the witnesses he ignored, had access to evidence from the criminal investigation - including the results of ██████ ████████'s rape kit - and given Mr. Haynes the time he needed to prepare a defense to the student conduct charges.

Fundamental Fairness and Equal Treatment: At the core of all due process procedures are the principles of fundamental fairness and equal treatment.  A reading of the circumstances of Mr. Haynes dismissal leads me to the conclusion that the institution failed in providing a fundamentally fair process and equal treatment to Mr. Haynes.  I reach this conclusion based on the following:

1.  Mr. Haynes was assumed to be an immediate risk of harm to the University without justification, depriving him of the presumption of innocence, and denying him access to his education without any process, based on an unproven claim by a single student, that resulted in his interim suspension.

2.  Dean Bornak (Dean of Student Development, Clarion University) was assigned to advise ████ ████████ following her claim of rape. Dean Bornak accompanied ████████████ to meetings with Mr. Shaffer and helped her prepare for the UCB hearing. Dr. Dede was assigned as Mr. Haynes' advisor or "ombudsman," but she stated in her deposition that she did not know what subject matters she should address in that role and did nothing to help him prepare for his UCB hearing.  She had only one meeting with him when she accompanied Mr. Shaffer to the jail to meet with him; she did not check on his welfare after he was released from jail, attempt to schedule a meeting with him, or reach out to help him in anyway.

3.  Upon a request from Dean Bornak and Mr. Shaffer, Dr. Dede contacted faculty members in ████ ████████'s classes and received special academic accommodations to help her complete her classes and exams; no attempt was made by Dr. Dede or other administrators to offer Mr. Haynes this same opportunity.

4.  ████████████ was offered counseling services and an opportunity to complete course work online; Mr. Haynes was not offered counseling services and was prohibited from completing course work online.

5.  Mr. Shaffer's presentation of the case to the UCB on December 3, 2013 (discussed in more detail below) showed no attempt to provide a neutral and objective review of the facts. He functioned in the hearing as an advocate for ████████████.

6.  Mr. Shaffer interviewed Mr. Haynes only once, while Mr. Haynes was incarcerated and was emotionally distraught -- according to Dr. Dede's deposition.

7.  When Mr. Shaffer interrogated Mr. Haynes in jail, he failed to inform Mr. Haynes of his right to have his attorney present. He also failed to inform him that what Mr. Haynes shared would be used in a disciplinary hearing against him. In addition, Mr. Shaffer did not explain to Mr. Haynes that what he told Mr. Shaffer was not confidential; it was subject to subpoena and disclosure in the pending criminal matter.

8.  Prior to the UCB hearing on December 3, 2013, ███████████ had a private meeting with Clarion University President Karen Whitney. At that meeting, ███████████ reports in her deposition that President Whitney told her that Clarion University *"will not tolerate even having allegations* [of rape] *against one of their students"*. When asked by the plaintiff's attorney to clarify if President Whitney did indeed say that Clarion University *"wouldn't tolerate having a student enrolled there who had a rape allegation made against him?"* ███████████ answered *"Correct"* (███████████ Deposition, p. 59-60).

    One can only conclude from this statement that Clarion University administrators intended to permanently dismiss Mr. Haynes once it was known that he had been accused of rape, regardless of the facts. Although President Whitney does not recall making this statement, ██████'s one-time private meeting with the University President is likely to have left a more indelible memory of the encounter than President Whitney's recollection of that meeting more than three years after it happened, because of the significance of that meeting to ███████████ and the number of meetings that President Whitney has with students. Regardless of what was actually verbalized by President Whitney, it is clear from her deposition that ███████████ left her meeting with the President believing that Mr. Haynes would be expelled from the University. Presumably, this is why she felt no need to remain after the UCB hearing to learn of their decision – she believed she already knew it - and it may have contributed to her decision to withdraw from the criminal proceedings.

9.  Mr. Shaffer, and other Clarion University administrators, knew that ███████████ had a "rape kit" examination done and that the physical evidence from that examination could corroborate either ███████████s accusation or Mr. Haynes' denial of that accusation. Rather than wait to learn what the physical evidence of the examination showed, Mr. Shaffer proceeded with the UCB hearing. The fact that he proceeded before the results of the examination where available, and knowing full well that those results could vindicate Mr. Haynes, strongly suggests that Clarion University administrators decided Mr. Haynes was guilty of the accusation long before the UCB hearing. Had University administrators been interested in learning the facts and giving Mr. Haynes a fair hearing, they would have at the very least waited until the results from the one piece of objective scientific evidence was available. Instead, it appears that University administrators only went through the procedural motions necessary to satisfy their judicial policies and legitimize their preconceived belief about Mr. Haynes' responsibility for the alleged conduct.

No objective review of Mr. Haynes's could conclude that the due process Mr. Haynes was afforded by Clarion University in this case met the principles of fundamental fairness and equal treatment.

**Option to Voluntarily Withdraw from the University**:  One solution to the problem created by the interim suspension was to have Mr. Haynes voluntarily withdraw from the University until the criminal matter was resolved.  This action would have preserved Mr. Haynes' academic standing, but it would have cost him his financial investment in the academic term, delayed his graduation, and caused him to retake courses he had by late October substantially completed.  Dr. Dede reports that she made two attempts to secure permission from Mr. Haynes' mother to withdraw him from his courses, but never raised the subject with Mr. Haynes.  Both attempts failed and Dr. Dede had no authority to withdraw Mr. Haynes without permission.

Given the circumstances of Mr. Haynes' interim suspension and incarceration prior to bail, Dr. Dede's attempt to have Mr. Haynes withdraw was the correct action. However, she was unsuccessful in communicating to Ms. Malone, Mr. Haynes' mother, that withdrawing from classes was not an admission of guilt but a procedural safeguard to protect Mr. Haynes' academic performance from suffering while he defended himself against the criminal and disciplinary charges. It is clear from Ms. Malone's deposition that she did not have a clear understanding from her conversations with Dr. Dede why withdrawing her son from the University while criminal and disciplinary matters were pending was in his best interest. More importantly, the record did not show that anyone attempted to directly contact Mr. Haynes to secure his permission to withdraw or to contact Mr. Haynes' attorney, Mr. Hindman, to have Mr. Haynes' withdraw.  Mr. Haynes had the ability to withdraw without parental approval and an experienced attorney, such as Mr. Hindman, may have been able to prevail on Mr. Haynes to withdraw had his help been enlisted by college administrators acting in Mr. Haynes' best interests.  In any event, as discussed below, the University could and should have remedied this situation by withdrawing Mr. Haynes from his classes once he was expelled.  However, University administrators failed do so and, Mr. Haynes received an "F" for each of his classes.

**In-Absentia University Conduct Board Hearing**: The Clarion University Judicial Policy allows for an in-absentia hearing when students are notified and they fail to appear. For routine matters of student misconduct, this policy is reasonable. However, to ask students facing concurrent felony charges on the same matter to appear at a hearing without the full benefit of legal representation to give tape recorded testimony that could jeopardize their legal rights against self-incrimination and other legal defenses, is not reasonable.  Statements made by Mr. Haynes at the UCB hearing would have been subject to subpoena by the District Attorney in the pending criminal matter and could have been used against him. The seriousness of the criminal charges and the possibility of long term incarceration if convicted precluded Mr. Haynes from participating in the UCB hearing without jeopardizing his defense against those charges. He was essentially asked to choose between risking his freedom or risking his education.

Mr. Shaffer knew or should have known the unreasonable risk he was asking Mr. Haynes to take by insisting that he appear at the UCB hearing while the criminal case was pending. Ms. Malone reminded him of this in a telephone conversation she had with him when she asked him to delay the UCB hearing. Before talking with Mr. Shaffer about delaying the UCB hearing, Ms. Malone talked with Mr. Hindman about her son appearing at the UCB hearing.  Mr. Hindman advised her *"not to let Tafari* [Haynes] *go speak"* at the UCB hearing, … *"because the criminal case was going on, and anything that Tafari says in the room* [UCB hearing] *they can use in the criminal hearing"* (Malone Dep. p. 62).  After speaking with Mr. Hindman, Ms. Malone immediately called Mr. Shaffer to convey this information and "asked him, please hold off until the criminal hearing. And he said he couldn't.  He said no" *Id*.

As a result, the UCB hearing was held without Mr. Haynes, leaving the UCB to render a judgment without an affirmative defense from him.  Although Mr. Shaffer reported on his interrogation of Mr. Haynes while Mr. Haynes was incarcerated, Mr. Shaffer's report was not a defense.  His recollection of his interrogation of Mr. Haynes differs from the deposition Mr. Haynes provided for the current litigation, leaving open the question of how accurately Mr. Shaffer was able to recall the details of that conversation.

University Conduct Board Hearing: The transcript of the UCB hearing showed procedural and process issues that merit concern.  Although there were some irregularities in the technical aspect of the hearing about who performed what duties at the hearing, most of these are unlikely to have influenced the UCB decision.  Other irregularities in the process deviated from the principle of fair and equal treatment to the disadvantage of Mr. Haynes.

1.  During the UCB hearing, and in correspondence, Mr. Shaffer chose to use the terms "reported survivor" and "reported perpetrator" to describe ▬▬▬▬▬ and Mr. Haynes respectively.[1] Language matters.  The word "survivor" was advanced by sexual assault prevention educators and advocates to define a person who survived an act of sexual violence.  It replaced the term "victim" because the word "survivor" was more empowering to women struggling with the trauma of rape and sexual assault.  The term is highly prejudicial when used to describe a complainant in a disciplinary proceeding. It presumes that the complainant has survived an assault before that matter is established and presumes that the accused student is the cause of that assault. Similarly, Mr. Shaffer described Mr. Haynes as the "reported perpetrator", a term commonly used by law enforcement to describe a person accused of committing a crime.  When used in the context of a disciplinary hearing with a student who is presumed innocent, the term is highly prejudicial. The terms commonly used by educators to describe a student accused of misconduct under a student conduct code are "respondent", "accused", or "student charged".  The person alleging the misconduct is commonly referenced as "complainant" or "person bringing the charge".

2.  At the UCB hearing, Mr. Shaffer reported on his recollection of the conversation he had with Mr. Haynes in the county jail.  Mr. Shaffer presented this narrative as Mr. Haynes' explanation of the events of October 26-27, 2013 before the board heard the narrative of events from the complainant. It is customary that the complainant testifies first to give the accused student the opportunity to face the complainant, challenge the accuracy of statements through some form of cross examination, and respond to the complainant without needing to guess at the scope of the allegation. The correct procedural sequencing would have allowed UCB members to have a context to better understand conflicting accounts.

3.  In presenting Mr. Haynes description of the events of October 26 -27, Mr. Shaffer offered his own opinion on what happened, stating that, "*I believe he* [Mr. Haynes] *had the intention of going over there* [▬▬▬▬▬'s apartment] *for what did occur*" (UCB Hearing Transcript, Dec. 3, 2013 p. 7).  Mr. Shaffer's declaration that he believed Mr. Haynes committed the acts of which he was accused, is highly prejudicial in a hearing where he is supposed to present evidence for the UCB to render a decision, and according to Vice President Tripp, is inconsistent with the neutrality that he should have shown at the UCB hearing (Tripp Dep. p. 99). Furthermore, Mr. Shaffer had no idea what Mr. Haynes' intentions were when he went to the party at ▬▬▬▬▬'s apartment.

---

[1] In fact, in several instances, Mr. Shaffer just referred to ▬▬▬▬▬ as "the survivor" and did not even bother to use the term "reported."

4.  Mr. Shaffer took the unusual step of calling himself as a "witness". What he witnessed was ███████ 's testimony at Mr. Haynes' preliminary hearing. Rather than having ████████████ explain the circumstance that gave rise to her complaint, he attempted to summarize what he heard at the preliminary hearing. By doing so, he denied UCB members the opportunity to judge ████████████ 's demeanor and credibility when she provided her account of the allegation.

5.  Mr. Shaffer told UCB members that the credibility of ████████████ 's testimony at the preliminary hearing "*was not questioned by either the prosecution nor the defense*" (UCB Hearing Transcript, December 3, 2013 p. 7), suggesting to the UCB that her testimony was accepted as truthful by both the prosecutor and the defendant. In actuality, credibility is not a factor at a preliminary hearing and Mr. Haynes' attorney made a statement at the end of the hearing acknowledging that legal principle. Mr. Shaffer misunderstood that statement and thought Mr. Haynes' lawyer believed ████████████ to be credible. In Mr. Shaffer's deposition, he admitted to not understanding that issues of witness credibility are not addressed in the preliminary hearing. Those issues would be addressed at a trial. Shaffer Dep. 100-101.

6.  The UCB was composed of 1 faculty member, 2 students, and 3 staff members. The faculty member chaired the hearing, but did not vote during the deliberation. Two of the 3 staff members selected by Mr. Shaffer work in student affairs and are colleagues of his. They were part of the Division of Student Affairs and had a reporting relationship to Vice President Tripp, just as Mr. Shaffer did. Vice President Tripp is the same person that implemented the interim suspension and is the person who had overall administrative responsibility for the University's disciplinary process. Having these two people on the UCB is analogous to allowing a district attorney to include two of his/her friends on a jury. Although they may be impartial, it gives the appearance of being biased.

**Standard of Proof:** The two most commonly used standards of proof in student conduct hearings are "preponderance of evidence" and "clear and convincing evidence". Clarion University uses preponderance of evidence, the lowest standard possible, which Mr. Shaffer defined in the UCB hearing as, "*just enough evidence to make it more likely than not that the fact that the person providing the information seeks to prove is true*" (UCB Hearing Transcript, December 3, 2013 p. 3). The preponderance of evidence standard is the one OCR Title IX guidelines recommend for adjudication of sexual assault complaints, and most universities have adopted this standard to avoid potential penalties and litigation arising from Title IX sexual assault complaints.

My opinion is that the standard of proof needed in student conduct cases should be proportionate to the seriousness of the offence. Students accused of rape and related acts of sexual violence face permanent expulsion from their chosen university, financial loss, loss of reputation, loss of future employment opportunities, and loss of educational opportunities beyond their current institution because many institutions, including graduate and professional programs, do not accept students for enrollment who are ineligible to return to their previous institutions or who committed serious infractions of a student conduct code. Using the preponderance standard to determine if an undergraduate student violated institutional policies prohibiting minor acts of misconduct, such as alcohol consumption in a college residence hall, is not unreasonable. Using that same standard to make decisions that could fundamentally change students' lives and damage their future, is unreasonable.

**Sanction and Grades:** The UCB recommended that Mr. Haynes be expelled permanently and this recommendation was ultimately approved by the President. There was never a recommendation that

Mr. Haynes receive failing marks in all of his courses for the 2013 fall term and the President did not order this as a sanction. Nevertheless, Mr. Haynes, who was prohibited from completing course work or taking exams because of interim suspension, was assigned failing marks in all of his courses for that academic term. Receiving all "F" grades in courses is not a sanction provided for under Clarion's judicial policy and students are not responsible for withdrawing themselves from a university when they are expelled. Expulsion is an involuntary dismissal of a student by the university. When this happens, the university is responsible for withdrawing the student from courses with letter grades showing that he/she did not complete the course. The usual grade assigned in such matters is a "W", indicating that the student withdrew or was withdrawn before completing the course.

Appeal: When criminal charges were dropped against Mr. Haynes and his record was expunged, he sought reinstatement as a student at Clarion University. His request was denied. He also appealed his expulsion to the President on the grounds that new evidence was available, namely the results of the rape kit showing the absence of his DNA and the decision by the District Attorney to drop all charges. His appeal was denied on the grounds that it did not fall within the 72-hour time limit for filling an appeal. At her deposition, President Whitney seemed unaware that the Clarion Judicial Policy has an exception to this 72-hour time limit. Whitney Dep. 108. The policy states: "*The university president reserves the right to amend sanctions or grant appeals at any time for a violation of the student conduct code*" (p.27). The appeal process provides for appeals in cases where (1) evidence not considered in the original case is now available and (2) appeals of a decision that was not based on substantive information and evidence. Mr. Haynes' appeal meets both of these criteria. The 72-hour time limit for filing an appeal cannot be read seriously to exclude "new evidence" which becomes available after 72-hours. Such an interpretation could only lead to the conclusion that the time limitations are arbitrary and capricious when new evidence becomes available after 72-hours of a hearing is automatically inadmissible.

President Whitney's decision to deny Mr. Haynes' appeal is consistent with the statement that she reportedly made to ▇▇▇▇▇ in their private meeting. By denying the appeal, President Whitney followed through on her commitment to ▇▇▇▇▇▇▇ to not allow any student who was alleged to have committed rape to be a student at Clarion University.

Independence of Student Judicial Proceedings and Criminal Court Proceedings: Depositions and other documents in the current litigation assert that criminal proceedings and disciplinary proceedings are independent and that a decision made in one type of proceeding is not determinative of guilt or innocence in the other proceedings. However, in this case the evidence provided at the UCB hearing was from a preliminary court hearing and was not based on an independent investigation by the University. If the proceedings are independent, it seems oxymoronic that evidence presented in the preliminary court hearing can be used in the UCB hearing by Mr. Shaffer but the dismissal of pending criminal charges by the District Attorney cannot be used as evidence by Mr. Haynes in his defense. If the findings of the preliminary court hearing were dismissed by subsequent investigation and evidence, then the information provided to the UCB was flawed and the University should consider that fact in the determination of Mr. Haynes' responsibility for the alleged assault.

## Title IX Compliance

In 2011, the Office of Civil Rights, U.S. Department of Education, issued guidance to educators concerning alleged acts of sexual violence under *Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 et seq*. The guidance was sent to educational institutions in the form of a "Dear Colleague Letter". On April 29, 2014, the Office of Civil Rights issued further clarification of those guidelines in the form of a 46-page

document entitled *Questions and Answers on Title IX and Sexual Violence* (available at:
http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf). Most of the additional
information provided in the 2014 document was available before 2013 or was otherwise available upon
inquiry to the OCR. The 2011 and 2014 documents summarize the procedures and processes OCR looks at
when evaluating institutional compliance with Title IX policies concerning allegations of sexual violence.

The guidelines are not part of Title IX legislation or other Federal law. Nor did the guidelines undergo the
required comment and rule-making process to make them official Federal regulations. The enforceability
of the guidelines is OCR's investigative and compliance authority to determine when in its' judgment an
institution is not in compliance with Title IX. A non-compliance violation could result in OCR assessing
monetary penalties and/or removing institutional eligibility to receive Title IV funds (student financial aid).
In addition, institutions found to be in non-compliance may be subject to civil litigation and damages from
complainants who can prove that an institution's non-compliance injured them or that it created a hostile
environment that negatively impacted them.

**Title IX and Students' Due Process Rights:** OCR guidelines acknowledge the importance of following
Federal due process procedures to ensure that the adjudication process for allegations of sexual violence
is fair and impartial.

> *The rights established under Title IX must be interpreted consistently with any federally
> guaranteed due process rights. Procedures that ensure the Title IX rights of the complainant, while
> at the same time according any federally guaranteed due process to both parties involved, will
> lead to sound and supportable decisions.* (OCR, *Questions and Answers on Title IX and Sexual
> Violence*, sec. C-5; p.13, 2014)

Clarion University did not need to compromise any of Mr. Haynes' due process rights to a fair and
impartial hearing to meet OCR Title IX guidelines.

**Interim Measures Following an Alleged Act of Sexual Violence:** OCR guidelines do not require or
recommend that students accused of sexual violence be suspended for an interim period during the
investigation into the complaint and subsequent adjudication - if merited by the investigation. The agency
assumes that both students will continue to be enrolled, but recommends that universities take "interim
measures" to keep the complainant and accused separated. Among the actions it recommends is that
universities separate students from sharing *"the same residence hall, dining hall, class, transportation, or
job location"* (OCR, *Questions and Answers on Title IX and Sexual Violence*, sec. G-2; p.33, 2014). At no
point does OCR suggest suspending an accused student for the interim period while the investigation is
conducted. OCR officials recognize that there are other ways for both students to continue their
education. Clarion University administrators failed to do the same.

**Clarion University's 60 Day Rule for Investigation and Adjudication of Sexual Assaults:** Clarion University
states that it *"will investigate most cases* [of sexual assault] *within 14 working days but no longer than 60
days prior to the beginning of an on-campus conduct hearing"* (Guide to Clarion University Judicial Policy,
2013-2014, p. 37). They justify this policy by claiming that OCR *"states that an investigation should take
no longer than 60 days from the report of an incident"* (p.37). The Clarion policy is based on an
incomplete reading of OCR guidelines. What OCR actually states is:

> *OCR does not require a school to complete investigations within 60 days; rather OCR evaluates on
> a case-by-case basis whether the resolution of sexual violence complaints is prompt and equitable.
> Whether OCR considers an investigation to be prompt as required by Title IX will vary depending
> on the complexity of the investigation and the severity and extent of the alleged conduct. OCR
> recognizes that the investigation process may take longer if there is a parallel criminal*

*investigation* [emphasis added] *or if it occurs partially during school breaks. A school may need to stop an investigation during school breaks or between school years, although a school should make every effort to try to conduct an investigation during these breaks unless so doing would sacrifice witness availability or otherwise compromise the process* (OCR, Questions and Answers on Title IX and Sexual Violence, sec. F-8; p.31-32, 2014).

Clarion University did not need to rush its investigation and hearing to meet a 60-day deadline; it could have granted an extension to allow Mr. Haynes sufficient time to learn the results of the rape kit and the decision by the District Attorney to drop all charges. OCR compliance investigations at the University of Vermont (OCR Complaint No. 01-95-2022; Mar. 27, 1995) and the University of Wisconsin- Madison (OCR Complaint No. 05-07-2074; Aug. 6, 2008) are two examples of where OCR decided that the circumstances of the investigations needed longer to resolve and that *"a nine-month delay between filing charges and resolution satisfies Title IX's requirement that grievance procedures be 'prompt'"* (Henrick, 2013, p.16).

Analysis and Opinion

Ethic of Caring: In her deposition, President Whitney spoke about an ethic of caring for Clarion University students. As a former student affairs professional, President Whitney's comments accurately describe an underlying principle of student affairs practice (Blimling, Whitt, & Associates, 1999). Clarion University demonstrated this ethic of caring for ███████████. Student affairs professionals and other educators provided ███████████ with a commendable level of care and offered her counseling, special accommodations to complete her course work, special accommodations to take her exams, an advisor who took an active role in helping her, and assistance in preparing for the UCB hearing. Mr. Shaffer even presented a synopsis of the events of October 26 – 27 to spare her any emotional strain that she may have experienced in describing the alleged actions of Mr. Haynes.

Unfortunately, Clarion University did not show this same ethic of caring for Mr. Haynes. Rather than helping him, the University suspended him without a hearing and before an investigation into the facts. Rather than treating him as innocent prior to his UCB hearing, the University President, according to ███, told her that Clarion would not tolerate having any student (including Mr. Haynes) accused of rape as a student at the University. Mr. Haynes was not provided with counseling, accommodation to take his classes, help in preparing for the hearing, or the benefit of someone reaching out, beyond a brief meeting at the county jail with Dr. Dede. Clarion University failed to meet its fiduciary duty to Mr. Haynes; instead, it abandoned him when he was most vulnerable. The University's actions prior to the UCB hearing forbid him access to programs, services, resources, and friends when he most needed them. Although Dr. Dede made two attempts to convince Ms. Malone to have her son withdraw and despite the brief encounter Dr. Dede had with Mr. Haynes at the jail, no other attempts were made to render Mr. Haynes the help he needed or to show the ethic of caring that was shown for ███████████.

Mr. Haynes is a member of an underrepresented group at Clarion University and reports in his deposition that he has experienced racial animus from others at the institution. He is also a first-generation college student and a first-generation American citizen who comes from a financially challenged background. First-generation college students are among the most vulnerable students enrolled and are more likely to drop-out of college than other students. Financial challenges and the need to work are part of the reason. However, the most important reason is that first-generation students lack the family resources necessary to help them navigate the complexities of the university system. Clarion University knew this about Mr. Haynes. He was an Educational Opportunity Program (EOP) student and had an EOP counselor, Mr. Joseph Croskey, in that program to help him while he was a student. Rather than recognize that Mr.

Haynes was faced with a significant challenge to navigate both the criminal court system and the complex student judicial system, Clarion University ignored his need for assistance and abandoned him.

**Inherent Limitations of Student Disciplinary Hearings:** Student conduct hearings were never designed as a vehicle to adjudicate violent felonies. They provide appropriate due process protections for the academic community to address student academic dishonesty and general adolescent misbehavior. They are inadequate forums to address serious criminal behavior. Students charged with violent felonies such as homicide, voluntary manslaughter, and rape should be adjudicated in the criminal court system where they have all of the constitutional protections, rules of evidence, and rights of appeal afforded to them in the justice system. The primary purpose of addressing student conduct in both administrative and judicial board hearings is educational. Ideally, students learn through the process of being engaged in a dialog about their behavior and by being held accountable for that behavior. Even when students' conduct results in their suspension from the university for a few months, students should learn from that experience and apply that knowledge when they return to the university. In such cases, universities usually remove the notation of suspension from students' official university records.

Permanent expulsion has no educational rationale. It removes students' property rights to their education and reputation, and robs them of many future career opportunities. For this reason, all 16 member institutions of the University of North Carolina and all of the campuses of Rutgers University eliminated "permanent" expulsion and replaced it with a form of "expulsion" that is subject to review and readmission after at least two years. For students approved for readmission who return to the university and complete their degrees, the notation of expulsion is removed from their academic record. Clarion University does not follow this policy or offer students an opportunity to clear their record once they are expelled. This is a harsh penalty to be rendered in a disciplinary hearing process that inadequately protects the rights and reputation of its students.

Student affairs professionals, who customarily administer campus judicial systems, are educators knowledgeable about the developmental needs of students, how to structure educational programs to increase student learning, how to manage student programs and services, and how to provide students with the help they need to become successful productive citizens. They are not trained as criminal investigators, lawyers, or judges. Members of disciplinary hearing boards often receive minimal training and most are not schooled in how to evaluate evidence, how to question witnesses, and when to challenge student conduct officers for failing to do a complete investigation. They have limited experience in evaluating the honesty or truthfulness of witnesses, and can easily be influenced by emotions or comments made by a student in the heat of anger or frustration.

**Inadequate and Impersonal Appeal Process:** Clarion's appeal process allows students to write an appeal within 72-hours of a UCB decision, but denies them the right to be heard in person by the person acting on the appeal. President Whitney could have responded to Mr. Haynes' appeal by ordering a further investigation, granting a new hearing so that Mr. Haynes could speak openly about the events of October 26-27, 2013, or allowing Mr. Haynes to return to Clarion and see if ▓▓▓▓▓▓▓▓ still wanted to pursue her complaint or amend it in light of the new evidence and her decision to withdraw from the criminal proceedings. Instead, President Whitney did what was administratively expedient; she opted to use the procedural technicality of the 72-hour time limit for an appeal as her reason for denying Mr. Haynes request - even though Clarion's policies allowed her to grant an appeal or change a sanction at any time she deemed appropriate.

Neither student conduct or criminal court hearings are infallible. Mistakes happen and innocent people are convicted. The criminal court system is replete with examples of people incarcerated for felonies only to find that years later DNA evidence or other new evidence exonerates them. Student conduct

hearings are no less fallible. Mistakes are made and when new evidence emerges, universities have an obligation to consider it.  Clarion failed to do so for Mr. Haynes.

Conclusions

My review of the depositions, hearing transcripts, exhibits, and other documents leads me to conclude that Mr. Haynes did not receive fair and impartial treatment in the investigation and adjudication of the allegations made against him in October 2013 by ███████████.  University administrators suspended him based on the allegation of one student and no corroborating evidence to support that allegation.  He was interrogated by Mr. Shaffer while he was in jail, without benefit of an attorney, without being informed that his statements would be used against him at a disciplinary hearing, and without being informed that what he told Mr. Shaffer could be used against him in the pending criminal complaint.

Prior to Mr. Haynes' disciplinary hearing, ███████████ met privately with President Whitney about the rape allegations she made against Mr. Haynes.  ███████████ left her meeting with the President with the belief that Mr. Haynes would be expelled from Clarion because the University would not tolerate even the allegation of rape made against one of its students.

Mr. Shaffer denied Ms. Malone's pleading to delay the UCB hearing to give her son the time he needed to resolve the pending criminal matter and collect the evidence he needed to defend himself.  With full knowledge that if Mr. Haynes testified at the UCB hearing he would jeopardize his legal rights in defending himself in the criminal matter, Mr. Shaffer proceeded to hold the hearing without Mr. Haynes. When Mr. Shaffer made the decision to proceed with the hearing, he was fully cognizant of the fact that the physical evidence from ███████████ s rape kit was forthcoming and that the results from the rape kit could have a material impact on the outcome of the hearing either supporting ███████████'s allegation or Mr. Haynes innocence.

At the UCB hearing, Mr. Shaffer had an opportunity to present an unbiased account of what he knew; instead, he became an advocate for ███████████.  He informed UCB members that "*I believe he* [Mr. Haynes] *had the intention of going over there* [███████████ s apartment] *for what did occur*", even though Mr. Shaffer had no idea of what Mr. Haynes intentions were, and should not have offered his own opinion about what Mr. Hayes did or did not do.  Mr. Shaffer's misjudgment went further when he misinformed the UCB that both the prosecutor and defense at Mr. Haynes preliminary hearing found ████ ███████████'s account of the alleged assault to be credible, which he later admitted was a misunderstanding of what was said at the preliminary hearing. Even Mr. Shaffer's language at the UCB was prejudicial. He called Mr. Haynes the "reported perpetrator" and ███████████ the "reported survivor", suggesting that she had survived an assault perpetrated by Mr. Haynes.

Mr. Haynes could not appear at the UCB hearing and testify while the criminal complaint was pending, and on the advice of his attorney, he did not attend the hearing.  The UCB proceeded without him and Mr. Haynes was eventually expelled.  A notation of expulsion was placed on his official University transcript and, because he was forbidden to take classes or exams, he received failing marks in his 2013 fall term courses. Even though the District Attorney dropped all charges and the Courts expunged all records of the criminal complaint, Clarion University continues to maintain the record of the failing grades and the notation of expulsion on his transcript.

The results of ███████████ s rape kit supported Mr. Haynes claim of innocence. It showed that his DNA was not present.  With all criminal charges dropped, the record of the criminal complaint expunged, DNA evidence supporting his claim of innocence, and the complainant withdrawing her support for the

criminal complaint, one would think that all of this information vindicating Mr. Haynes would be relevant in seeking an appeal of the UCB decision and reinstatement in the University. But, it was not. When Mr. Haynes brought this information to the attention of Clarion University his request for readmission and his appeal were both denied. President Whitney denied his appeal by using the excuse that the request came more than 72-hours after the UCB hearing - an arbitrary time limit the University created to hear appeals - even though President Whitney had the right to grant the appeal or change the sanction at any she wished.

Mr. Haynes suffered from the unproven accusations made by ███████████ and the unfair treatment he received from Clarion University. He lost not only his right to continue as a student at Clarion University, his reputation, financial losses, "F" grades, a damaging notation on his University transcript, and a two-year delay in completing his college degree, he also suffered significant emotional damage and stress. Ms. Malone, Mr. Haynes mother, said at her deposition that following his interim suspension and temporary incarceration prior to posting bail, he returned home in a "bad state". He would, "yell out in his sleep", was depressed, would not eat, urinated in his bed while sleeping, and would not leave his bedroom at her home. His depression so bad that his mother feared he would commit suicide. Fortunately, Mr. Haynes received professional psychological help and is still seeing a therapist. However, Ms. Malone reported in her deposition that since his experience at Clarion he has never been the same person he was. The accusation, criminal proceedings, and expulsion from Clarion University changed him in ways that makes her sad.

This did not need to happen in the way that it did. Had Clarion University presumed Mr. Haynes was innocent, instead of jumping to the conclusion that he was guilty and suspending him; allowed him to remain on campus and continue his education, instead of prohibiting him from being on campus; offered him counseling and academic accommodations like it offered ██████████; delayed the UCB hearing until the criminal court proceedings were concluded, or at the very least waited to get the results from the rape kit examination showing that he did not commit the act of which he was accuse; he would not have suffered all that he has suffered. In my opinion, Clarion University failed in its fiduciary duty to care for Mr. Haynes and to treat him fairly in the University's adjudication of the accusations made against him.

References

Blimling, G., Whitt, L., & Associates (1999). *Good practice in student affairs: Principles to foster student learning*. San Francisco: Wiley/Jossey Bass.

Henrick, S. (April 18, 2013). A hostile environment for student defendants: Title IX and sexual assault on college campuses. *Northern Kentucky Law Review*. Available at http://chaselaw.nku.edu/content/dam/chaselaw/docs/academics/lawreview/v40/nklr_v40n1_pp049-092.pdf.

Office of Civil Rights, U.S. Department of Education (2011). Dear Colleague: Guidance do educators concerning alleged acts of sexual violence under *Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 et seq*. Available at: https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html.

Office of Civil Rights, U.S. Department of Education (2014). *Questions and Answers on Title IX and Sexual Violence* (available at: http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf).

Appendix I

1. Depositions with Exhibits for:
   a. Mathew Shaffer
   b. K███ S█████████
   c. Christopher McCarrick
   d. Tafari Haynes
   e. Jocelind Gant
   f. Brenda Dede
   g. Karen Whitney
   h. Harry Tripp
   i. Hyacinth Cynthia Malone

2. Hearing Transcripts:
   a. Commonwealth of Pennsylvania vs. Tafari Andrew Haynes, Preliminary Hearing, November 5, 2013
   b. University Conduct Board Hearing of Tafari Haynes, December 3, 2013

3. Clarion University Documents
   a. Clarion University Judicial Policy
   b. Tafari Haynes Academic Transcript
   c. Sexual Harassment Policies and Procedures
   d. University Conduct Board Handbook
   e. University Conduct Board Training
   f. Sexual Assault Report
   g. Tafari Haynes Appeal of University Conduct Board Hearing Recommendation

4. Court Documents
   a. Expungement Order
   b. Letter to Judge Benson on 10-4-16
   c. Second Amended Complaint of Haynes vs Clarion, U.S. District Court, Western District of Pennsylvania 4-20-16

5. Other Documents
   a. Clarion News Article about Mr. Haynes' Arrest
   b. Chart of Students Charged with Sexual Assaults at Clarion University
   c. List of Available Witnesses to Allegations of Misconduct on October 26-27, 2013
   d. Articles and Resources in the List of References
   e. Consulted Article: John Wesley Lowery, Navigating past the "spirit of insubordination": A twenty-first century model student conduct code with a model hearing script Edward N. Stoner II, *Journal of College and University Law*, Volume 31, Number 1, 2004, 1. Available at: http://www.edstoner.com/uploads/stoner___lowery_JCUL_2004_cropped.pdf.
   f. Consulted: U.S. Department of Education (2016). *Campus safety and security: Aggregated data for calendar years 2013- 2015*. Available at: https://ope.ed.gov/campussafety/#/datafile/list.